UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case |
| | ) No. 08-63556-fra13 |
| JOSEPH J. LUPO, | ) |
| Debtor. | ) |
| | ) Adversary Proceeding |
| UNITED SERVICES ASSOCIATED, Inc., | ) No. 08-6196-fra |
| Plaintiff, | ) |
| vs. | ) |
| JOSEPH J. LUPO, | ) MEMORANDUM OPINION |
| Defendant. | ) |

I. INTRODUCTION

The Debtor, Joseph Lupo, Jr., is a former employee of United Services Associated, Inc., which does business in Oregon as (Steamway) Disaster Restorations ("SDR"). Plaintiff claims that the Defendant, who is the Debtor in the underlying bankruptcy case, is indebted to it on account of a series of misappropriations of funds, and that these claims should be excepted from discharge in bankruptcy. A trial was held beginning on April 20, 2009, at the conclusion of which the matter was taken under advisement. The Court finds for the Plaintiff on some, but

Page 1 - MEMORANDUM OPINION

not all, of its claims, and holds that the claims that are established are excepted from discharge.

## II. PROCEDURAL POSTURE

Plaintiff brought an action for damages against Defendant in the Circuit Court for Linn County, Oregon. On the eve of trial, Defendant filed a petition for relief in this Court under Chapter 13 of the Bankruptcy Code. Shortly thereafter, the Debtor/Defendant removed the State Court proceeding to this Court. Plaintiff filed an amended complaint setting out its original claims, with additional counts alleging that its claims against Defendant are excepted from discharge under 11 U.S.C. § 523. At trial, Plaintiff's attorney moved to substitute Plaintiff's claim for nondischargeability, originally made under § 523(a)(6), to one under § 523(a)(4).[1]

The Court finds that this adversary proceeding is a core proceeding, and subject to trial and entry of judgment by the Bankruptcy Court. 28 U.S.C. § 157(b)(2).

The Court has considered the testimony, exhibits and arguments of the parties, and now issues this memorandum opinion as its findings of fact and conclusions of law.

## III. FACTS

Defendant was originally employed by Plaintiff in November 1998. He entered into a written employment agreement (Exhibit 2) which included a provision that "during the term of employment [Defendant] agrees not to become engaged with or in any company, industry or business

---

[1] A claim of the type described by § 523(a)(4) is nondischargeable in chapter 13 pursuant to § 1328(a)(2).

Page 2 - MEMORANDUM OPINION

in competition with employer." Also in the agreement was a provision whereby the Debtor undertook not to compete with the Plaintiff's business within a 50 mile radius of the Plaintiff's territory for a period of one year after termination of the employment.

The Plaintiff's relations with its employees and the employees' duties and obligations are spelled out in considerable detail in an employment guide provided to each employee (Exhibit 5). Of particular importance to the company were policies prohibiting conflicts of interest. The company strongly discouraged outside employment, and flatly prohibited employment in competition with Plaintiff's business.

While not prohibited, the company strongly discouraged overtime, preferring to end an employee's workweek as soon as it reached 40 hours. This policy was applied to all employees, including the Defendant, even after the Defendant took on enhanced duties as a supervisor.

Defendant was originally employed at $10 per hour. Eventually his salary reached $16 an hour, supplemented by frequent bonuses. Defendant's tax returns reflect total wages and salaries of over $50,000 in 2003 and 2004, the last two full years of employment.

Defendant did well in the early years of his employment, and by the year 2000 had been entrusted with considerable responsibilities. As the company's production manager, he was generally charged with the initiation and supervision of most of its business projects. However, the relationship was not free from tension. Defendant believed that he was underpaid, a position that Plaintiff disputed on several occasions. Defendant repeatedly requested Plaintiff to adopt, in writing, an

Page 3 - MEMORANDUM OPINION

expansive bonus provision for company employees, of which Defendant would be the principal beneficiary. Plaintiff just as resolutely resisted these demands.

Commencing in 2003, Defendant, taking advantage of his position with the company, began diverting funds from the corporation. In several instances, he induced the company's customers to make payments by way of checks addressed to the Defendant, often by representing that he was a partner in the enterprise. In others he contacted potential clients of the company, noted on the company's records that the proposed job had been declined, and then undertook to do the work, using the company's employees, in his own name or under his own assumed business name.

These practices continued until July of 2005, at which time the schemes were revealed to Plaintiff by other employees. Defendant was immediately terminated. Plaintiff then undertook a painstaking review of its files, accumulating several hundred pages of evidence of misdirected jobs and/or payments.

All told, Defendant received payments from customers of money that should have been paid to the Plaintiff, or received money from jobs diverted from the Plaintiff, totaling $118,403.93 (see Exhibits 73 through 75).

## IV. ANALYSIS

The principal duty of the Bankruptcy Court in this matter is to determine the applicability of the Bankruptcy Code, and specifically whether the Plaintiff's claims are excepted from discharge. In order to do so, the Court must liquidate the claim. The Plaintiff must establish the validity of its claim by a preponderance of the evidence, and

likewise must establish by a preponderance of the evidence that the claim, once liquidated, is excepted from discharge.

Defendant does not dispute the receipt of the funds or that he undertook to do the jobs originally available to the Plaintiff. He insists that, with respect to each job, it was undertaken with the Plaintiff's knowledge and consent. The rationale behind the undertaking was that the Plaintiff, in its efforts to limit overtime by its crew, had many hands left with nothing to do by midweek. Defendant claims that he convinced Plaintiff to give its permission to these side jobs in order to keep the employees working after their 40 hour per week limits had been reached.

Defendant's arguments are not persuasive. Use of company personnel, and of the company's contractor's license, equipment, and other assets, is contrary to every aspect of the corporation's culture and operations presented at trial. The amount of cash that ultimately flowed to the Defendant belies Defendant's assertion that the projects could not have been profitable to the Plaintiff.

The Defendant states that in 2003 he approached David Brown, Plaintiff's president, and suggested that he could use SDR's employees on their off-duty hours to do small jobs that would not be profitable to SDR and that SDR was turning down for one reason or another. He told Mr. Brown that a number of SDR's skilled employees were unhappy with SDR's failure to provide raises or award promised bonuses and were considering quitting. The crew could earn extra money on their off-time and SDR would profit by not losing valuable employees. Defendant states that Mr.
// // //

Brown agreed to allow the Defendant to start up his side business, but that he did not want SDR to incur any expense whatsoever.

Plaintiff denies that any such agreement was made with the Defendant. The Defendant did not have a Construction Contractor's License (CCL), essential to performing the sort of work SDR engages in. In order to engage in his side-business, the Defendant used SDR's Contractor's License when dealing with customers. Customers of the Defendant, then, would expect that in the event they had a claim against the Defendant for work done, they could file it with the Construction Contractor's Board and be compensated out of the mandatory bond required of licensees. It is not likely that Plaintiff would allow Defendant to use its CCL for work over which it had no control or knowledge, especially given the testimony and documentary evidence showing the control Plaintiff exerts over every aspect of its work and associated expenses.

A. <u>Funds Diverted from Plaintiff to Defendant</u>

Plaintiff's Exhibits 73 and 74 detail jobs performed using SDR crews and equipment in which either the entire payment or a partial payment from the customer was made to the Defendant rather than to SDR. These were SDR jobs in which the costs were incurred by SDR and the full payment should have been made to SDR. These diverted payments total $81,502.82, and essentially constitute a theft of funds.

B. <u>Projects Diverted from Plaintiff to Defendant</u>

Plaintiff's Exhibit 75 shows payments made to the Defendant on projects that would have gone to SDR, but that Defendant diverted to himself. He hired and paid SDR's employees to work on the jobs and

Page 6 - MEMORANDUM OPINION

otherwise incurred the costs of the jobs himself.  The payments for these projects total $45,333.53.

Under Oregon law, the wrongful diversion of another business's potential customers constitutes a claim for "intentional interference with economic relations," an intentional tort.  A claim includes the following elements:

> (1) the existence of a professional or business relationship [i.e. between the plaintiff and the customer] (which could include, e.g. a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accompanied through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

Douglas Medical Center, LLC v. Mercy Medical Center, 203 Or.App. 619,630, 125 P.3d 1281,1287 (2006)(internal citation omitted). In the present case, Defendant used his position within SDR to divert business to himself that would have otherwise gone to SDR.  Potential customers sought the services of SDR through SDR's advertising or by word of mouth, but the project was instead taken by the Defendant.  Had the potential business instead been directed to SDR, the profits from the diverted projects would have accrued to SDR.  Elements 1 - 5 of the intentional tort have thus been established.

A recovery may be had in tort actions for loss of profits "provided their loss is the proximate result of the defendant's wrong and they can be shown with reasonable certainty." Marr v. Putnam, 213 Or. 17,38, 321 P.2d 1061,1072 (1958).  "The fact that a plaintiff may not be able to fix its lost profits with precision will not preclude recovery of damages, but courts require a 'reasonably accurate and fair basis for the

Page 7 - MEMORANDUM OPINION

computation of alleged lost profits.'" Shalley et al. v. Borough of Sea
Bright et al., 2009 WL 1324024, p.5 (N.J.Super.A.D. 2009)(internal
citation omitted).

A reasonably accurate and fair basis for determining lost profits for diverted projects in the circumstances of this case is to multiply the gross receipts received by the Defendant from diverted projects by the average gross profit percentage obtained by the Plaintiff over the years at issue (2003 to 2005). Using the average gross profit percentage as calculated from Plaintiff's tax returns provides lost profits from diverted projects of: $45,333.53 X 61% = $27,653.45.

C. File Reconstruction and Research Costs

Plaintiff seeks damages of $111,629.19 as compensation for the cost of research and the reconstruction of files incurred by Plaintiff in determining the amount of losses borne by Plaintiff due to the actions of the Defendant. The costs were incurred in the years 2005 to 2008, with the bulk of the work done in 2006 and 2007. The largest single charge is for David Brown, the principal of the Plaintiff, in the amount of $69,060 for 479 hours at $140/$150 per hour. Staff time at $48/hour makes up $31,056 of the amount. A charge for consultants of $9,696 and for "print, photocopy, postage, etc." of $1,817 makes up the remainder.

The Court is of the opinion that these costs were incurred[2]

/ / / / /

/ / / / /

---

[2] There is no evidence beyond the summary sheet for Exhibit 64 that the majority of these costs were in fact paid by the Plaintiff, or that they were reasonable in amount. There is also some evidence that questionable expenses for transportation and meals and entertainment have been included.

Page 8 - MEMORANDUM OPINION

primarily in anticipation of litigation in the Oregon courts[3] rather than damages directly related to the injury suffered. They also do not qualify as "costs and disbursements" under Or.R.Civ.P. 68A(2)[4] or O.R.S. Chapter 20, which may be awarded to the prevailing party. As such, these amounts will not be allowed.

D. <u>Dischargeability Under Section 523(a)(4)</u>

Plaintiff asks the court to declare its claim against the Defendant to be nondischargeable under 11 U.S.C. § 523(a)(4). That provision excepts from discharge any debt "for fraud or defalcation while [the debtor was] acting in a fiduciary capacity, embezzlement, or larceny." Because the fiduciary capacity described by § 523(a)(4) requires the existence of an express or technical trust, <u>Ragsdale v. Haller</u>, 780 F.2d 794, 796 (9th Cir. 1986), not present in the present case, we are left with embezzlement or larceny.

The exception from discharge for debts from embezzlement or larceny "excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the onset, and therefore a larceny, or whether the

---

[3] Prior to the filing of the current action in the Linn County Circuit Court, which was subsequently removed to the bankruptcy court, Plaintiff caused to be filed a criminal complaint against the Defendant in state court.

[4] "Reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services, and include the fees of officers and witnesses; the expense of publication of summonses and notices, and the postage where the same are served by mail;...the compensation of referees; the expense of copying of any public record, book, or document admitted into evidence at trial; recordation of any document where recordation is required to give notice of the creation, modification or termination of an interest in real property; a reasonable sum paid a person for executing any bond, recognizance, undertaking, stipulation or other obligation therein; and any other expense specifically allowed by agreement, by these rules, or by any other rule or statute...."

Page 9 - MEMORANDUM OPINION

1 appropriation took place unlawfully after the property was entrusted to
2 the debtor's care, and therefore was an embezzlement." 4 Collier on
3 Bankruptcy ¶ 523.10[2] (15th ed. rev'd 2008).

4 　　　　The claims for lost profits from diverted jobs and the claim
5 for diverted funds constitute claims resulting from the unlawful
6 appropriation of the Plaintiff's property. In the case of the diverted
7 funds, a job was completed by the Plaintiff, but the payment by the
8 customer was made to the Defendant at Defendant's direction. In the case
9 of the diverted jobs, the Defendant used his position with the Plaintiff
10 to take customers and the resulting profits that rightfully belonged to
11 Plaintiff, with the intent of depriving the Plaintiff of same. The claim
12 for $109,156.27 is nondischargeable under § 523(a)(4).

13 E. Plaintiff's Claim for Punitive Damages

14 　　　　The Complaint asks for an award of punitive damages in the
15 amount of $100,000. Because the claim for damages arises under Oregon
16 law, the law of Oregon governs punitive damages in this case. See Dixie
17 Farms Market v. Dye, 28 Fed.Appx 673, 2002 WL 24573 (9th Cir. 2002).
18 Punitive damages are recoverable in a civil action in Oregon if it is
19 proven by clear and convincing evidence that the party against whom
20 punitive damages are sought has acted with malice.[5] O.R.S. 31.730(1).
21 Malice, as used as a basis for punitive damages, signifies a "wrongful
22 act done intentionally, without just cause or excuse." 2-D's Logging,
23 Inc. v. Weyerhaeuser Co., 53 Or.App. 677,686, 632 P.2d 1319,1325 (1981).

---

[5] Or "has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

Page 10 - MEMORANDUM OPINION

"Punitive damages can only be justified on the theory of determent....It is only in those instances where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent, that the use of punitive damages is proper." Hicks v. Lilly Enterprises, Inc., 45 Or.App. 211,216, 608 P.2d 186,189 (1980)(citing Noe v. Kaiser Foundation Hosp., 248 Or. 420,425, 435 P.2d 306,308 (1967)). "Punitive damages are not a substitute for compensatory awards nor an offset against litigation expense," and have never been viewed by Oregon courts "as an entitlement or right protected by the Oregon Constitution." DeMendoza v. Huffman, 334 Or. 425,444, 51 P.3d 1232,1243 (2002)(internal citations omitted). "[T]he jury has entire discretion to refrain from giving any punitive damages at all even though all the elements of malicious and damaging misconduct may have been established." Van Lom v. Schneiderman, 187 Or. 89,108, 210 P.2d 461 (1949).

"In a case where punitive damages are alleged, the wealth of the defendant is pertinent to the issue, and material and necessary." State of Oregon v. Dooley, 270 Or. 37,42, 526 P.2d 563,566 (1974).

In the present case, the Court is satisfied by clear and convincing evidence that the Defendant acted with the requisite "malice"in his actions toward the Plaintiff. That being said, the Court will not award punitive damages.[6] While there was no evidence presented at trial regarding the financial condition of the Defendant, the Court

---

[6] Any award of punitive damages would be subject to O.R.S. 31.735 which requires that 60% of any punitive damages award be paid over to the Oregon Department of Justice. See DeMendoza v. Huffman at 431-32.

Page 11 - MEMORANDUM OPINION

has the benefit of Defendant's bankruptcy schedules, of which judicial notice will be taken. The schedules reveal that the Defendant has minimal net worth and a modest income supporting several elderly family members and his wife. Moreover, given Debtor's income and lack of net worth, the sizable judgment to be awarded in this adversary proceeding and the fact that it may not be discharged in Debtor's present or any future bankruptcy provides sufficient deterrent value in itself.

F. <u>Defendant's Counterclaims</u>

Defendant claims that the Plaintiff is indebted to him for additional compensation in an amount alleged at trial to be between $318,713 and $337,384. The basis of the claim is an alleged agreement whereby Plaintiff would pay to all its employees bonuses equal to 25% of the company's gross operating revenues, and that Defendant would receive 45% of this pool. Plaintiff steadfastly denies that any such arrangement was agreed to, and Defendant presents no evidence to corroborate his claim. Financial information presented at trial suggests that any such arrangement would have eliminated any trace of profit for the corporation's owners. Quite simply, the Defendant fails to sustain his burden of proof with respect to the alleged bonus agreement.

At the close of the evidence, the Defendant amended his counterclaim, with the Court's consent, to allege an entitlement to the money he claims on the basis of *quantum meruit*. To calculate the additional amount required to make Defendant whole under this theory, the Defendant used the same bonus formula discussed above, but applied it against a calculation of *net* profit (i.e. gross profit reduced by a "fair" calculation of overhead), which produces the amount of $172,909.

While the Defendant was entitled to make the amendment, the claim is not supported by the evidence.

*Quantum meruit* provides damages "in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship." Blacks Law Dictionary 1276 (8th ed. 2004). A quasi-contractual relationship is one implied-in-law where an *actual* contract does not exist. The Plaintiff argues that the Defendant's original employment contract was in force throughout the time that Defendant was employed by Plaintiff, even though his duties and rate of pay had changed. Defendant argues that a new contract was formed, albeit an oral one, when the Defendant was promoted to production manager, and that the new oral contract included the bonus formula. Defendant then argues that if the new contract is not enforceable due to ambiguity, a fair measure of *quantum meruit* damages would be to use the bonus formula against a "fair" calculation of net income.

Assuming, *arguendo*, that a new oral, but unenforceable, employment contract was formed when Defendant was promoted, or that Defendant worked under no contract, Defendant has not provided evidence showing that he was under-compensated for the services he provided. Evidence was presented showing that profits increased substantially during Defendant's tenure and Defendant testified that he had referred a fair amount of work to Plaintiff from his friends and family and that he worked overtime and on weekends. Mrs. Brown, as a principal and employee of the Plaintiff, testified and provided documentation showing that the Defendant's total compensation (i.e wages, bonuses, and company-provided benefits for health, pension and vehicle) substantially exceeded the

Page 13 - MEMORANDUM OPINION

average for his position in comparable companies.  While Defendant may have provided valuable services to the Plaintiff, the evidence indicates he was adequately compensated for those services.

V. CONCLUSION

The Court will enter a money judgment for the Plaintiff in the amount of $109,156.27[7], with a declaration that it is excepted from discharge under 11 U.S.C. §§ 523(a)(4) and 1328(a)(2). Defendant's counterclaim is denied in its entirety.

*/s/ Frank R. Alley*

FRANK R. ALLEY, III
Bankruptcy Judge

---

[7] $81,502.82 + $27,653.45. Plaintiff also submitted its Exhibit 76 showing additional alleged minor defalcations totaling $11,804.78.  Evidence of these alleged defalcations is either inconclusive or unpersuasive.

Page 14 - MEMORANDUM OPINION